## HAMILTON LABORATORIES, Inc., v. MASSENGILL.

### No. 8238.

Circuit Court of Appeals, Sixth Circuit.

May 8, 1940.

W. B. Morton, of New York City (Green, Webb, Bass & McCampbell, of Knoxville, Tenn., and H. Stanley Mansfield, of New York City, on the brief), for appellant.

Clair V. Johnson and David A. Woodcock, both of New York City (Frank W. DeFriece, of Bristol, Tenn., and Watson, Bristol, Johnson & Leavenworth, of New York City, on the brief), for appellee.

Before SIMONS, HAMILTON, and ARANT, Circuit Judges.

SIMONS, Circuit Judge.

The patent, the validity of which alone is in issue in the present infringement suit, is one to Lyle A. Weed, No. 2,014,676, granted September 17, 1935, upon an application filed November 19, 1934. It relates to germicides suitable for internal and external medication, and to methods of destroying, in the presence of living tissue, micro-organisms which are pathogenic to man or higher animals. Infringement of the claims in suit is conceded if the claims be valid. A decree of invalidity, for want of patentable invention over the prior art, is challenged by the appeal.

The specification of the patent declares "the germicidal pharmaceutical preparations embraced in the present invention are organic mercury compounds in which the mercury atom is attached by one valence to a carbon atom of a benzene ring, and by the other to an atom or radical which forms an anion when the compound is dissolved in water." It was, of course, long known that mercurials were powerful germicidal and antiseptic agents. The problem envisaged by Weed was to discover compounds of mercury completely destructive

of micro-organisms and yet innocuous to animal tissue, for it is obvious that germicidal preparations, however potent in destroying such organisms, cannot be used for combating pathogenic germs in the human body if toxic to the patient.

Weed began his study of organic mercurials and their effect upon micro-organisms, when, as a student in 1928 under Professor Hixson at Iowa State College, he was required to submit a thesis for his master's degree. He tested the effect of a number of organic mercurials upon micro-organisms and reported bactericidal effect for phenyl-mercury-nitrate and others. While perhaps not determinative of ultimate issues in the present case, the Weed thesis is in the prior art and marks a step in its development since it was put on file in the library of the college, available to students there and to other libraries having exchange arrangements with Iowa State. John Crossley & Sons v. Hogg, C. C., 83 F. 488, 490; Britton v. White Mfg. Co., C. C., 61 F. 93, 95. We think intent that the fruits of research be available to the public is determinative of publication under the statute whether the paper be printed or typewritten, although the court below decided otherwise.

There followed five distinct applications by Weed to the patent office for patent protection of his earlier and subsequent discoveries between 1929 and 1934, the fifth of which alone matured into a patent—the others either being rejected or becoming abandoned. His earlier applications asserted the value of phenyl-mercury-nitrate as a microbicide against bacteria, molds and fungi, and as a poison for low animal forms such as protozoa. Later applications described the same compounds for germicidal value whether on man and higher animals or on plants. This recital becomes important only because of the contention here made that prior art uses of mercury compounds as agricultural insecticides lie in an art non-analogous to that of pharmaceutical germicides. .

Claims 1, 3, 4, 5, 7 and 8 of the patent are in issue. The first three are for a method of treating pathogenic germs while they are in contact with animal tissue, and the second three are for the germicidal preparations claimed to constitute the subject-matter of the discovery. The claims in issue are all printed in the margin.[1]

The controversy in the court below revolved to large extent about the precise nature of the alleged discovery. It is variously stated by the appellant's counsel, and has given us much difficulty. The subject-matter of the patent is said to be a germicidal pharmaceutical preparation for a stated use. It is not, as we understand it, contended that the preparation itself was unknown, but rather that its preparation for its presently asserted use was unknown. It is conceded, for example, that a number of organic mercurials were known long prior to the patent in suit to have pharmacological value, and that the toxicity of these

1. The method of treating pathogenic germs while they are in contact with tissue of living higher animals for the purpose of rendering the germs innocuous and without harming the animal, which comprises contacting said germs in situ with a solution of a suitable concentration of an organic mercury compound having the formula RHgX wherein R represents a phenyl radical carrying no substituent groups which will react with either alkalies or acids to form salts, and wherein X represents an element or radical which exists as an anion when the compound is dissolved in water.

3. The method of claim 1 wherein said organic mercury compound is a phenylmercury compound having the formula $C_6H_5HgX$ wherein X is an element or radical which exists as an anion when the compound is dissolved in water.

4. The method of claim 1 wherein the organic mercury compound is basic phenylmercuric nitrate.

5. A germicidal preparation for use in suitable concentration in contact with tissue of a living human being or other higher animal for the purpose of combating the attack of pathogenic micro-organisms on said animal, without harming the animal, comprising an organic mercury compound having the formula RHgX wherein R represents a phenyl radical carrying no substituent groups which will react with either alkalies or acids to form salts and wherein X represents an element or radical which exists as an anion when the compound is dissolved in water.

7. The germicidal preparation of claim 5 wherein said organic mercuric compound is a phenyl mercury compound having the formula $C_6H_5HgX$ wherein X is an element or radical which exists as an anion when the compound is dissolved in water.

8. The germicidal preparation of claim 5 wherein said organic mercuric compound is basic phenylmercuric nitrate.

compounds was less than the toxicity of uncombined metallic mercury, but the patentee, it is said, is not claiming broadly organic mercurials sufficiently germicidal to be pharmacologically useful and at the same time innocuous to man, but is claiming only a definite group of such mercurials possessing distinctive characteristics not possessed by organic mercurials previously used, which characteristics give to the compounds of the patented group, a unique biological behavior in combating disease germs. Nor is it contended that this group was unknown in the sense of never having been synthesized in any chemical laboratory. It is conceded that some of the organic mercurials in the group were undoubtedly known in the sense of having been previously produced by chemical experimentation, but asserted that they were not used pharmaceutically. The present disclosure is, therefore, not to be interpreted, it is urged, as defining but a new use for an old compound. It is more accurate and informative, says the appellant, to define the patented invention as a method of combating disease germs in a manner to utilize the discovery by Weed of the unique possibilities of a specifically defined class of organic mercurial compounds. While thousands of compounds falling within the class included in plaintiff's claims can be made and probably would be as effective in use as those which have been made and used by the patentee, they have never been made for the disclosed use.

The germicidals claimed in the patent are organic mercury compounds having the formula RHgX. The R of the formula represents a phenyl radical having no solubilizing substituent groups, and the X an element or radical which exists as an anion when the compound is dissolved in water. This constitutes a limitation, it is asserted, and it is the failure of the court to recognize this limitation which led to error.

The decree of invalidity was based upon the prior art, in which the most pertinent reference was the article published in 1924 by E. C. White, in "Industrial and Engineering Chemistry," entitled "New Organic Mercurials and their Therapeutic Application." White's article disclosed:

"Numberless combinations of mercury with organic substances have been made. They range from simple mercury salts of organic acids through the so-called complex salts of mercury with basic substances, to the true organic mercury compounds. The last class, which is the one that has shown most interest from the therapeutic standpoint, includes only those compounds in which a mercury atom is bound by one or both bonds directly to carbon. For the purposes of this discussion we may eliminate the aliphatic substances of this class, none of which has given promise of therapeutic usefulness, and confine ourselves to the aromatic group. Our compounds are, then, of two groups, the singly bound and the doubly bound types:

$$\text{RHgX} \qquad \qquad \text{RHgX}$$
$$\text{I} \qquad \qquad \qquad \text{II}$$

in which R represents a benzene ring with or without substituent groups, and X represents a group such as $OOCCH_3$, OH, a halogen, CN, CNS, or the thiosulfate group. Experience has shown that compounds of Type II are relatively inert both in toxicity and in bactericidal action. (An exception appears in the work of DeWitt, who found that certain doubly bound mercurials had marked effect on the tubercle bacillus in vitro.) Our consideration then narrows down to substances of the first group. This is a limitation of type but not of number, for when we consider that in the group R we may substitute single groups of concatenations of any complexity we see that the whole gamut of aromatic chemistry may be run in the synthesis of mercurials for pharmacological study."

The court thought the White article to state a formula and to point out the whole field in which organic mercury might or might not produce compounds of tolerable toxicity, and that he told those interested in the art to take it, try the various combinations within the permitted substituent groups, and that when so tried the whole story of pharmacological mercurials would unfold. The appellant's challenge to this conclusion is based on the argument that the White article merely disclosed to the research chemist the limitless number of compounds in the field of organic mercurials, and ventured the prophecy that investigation in that field might yield further compounds having pharmacological value, but made it plain that these additional compounds might be discovered only by laboratory research. This research the patentee pursued to the end that

a useful discovery resulted in defining a field within the range of White's prophetic vision wherein compounds of pharmacological value reside. This field is limited to compounds wherein the X represents an element or radical which exists as an anion when the compound is dissolved in water, a limitation which not only excludes the organic mercurials previously used in pharmaceutical preparations but defines certain essential characteristics of the patented compound. The R of the formula is the benzene ring either with or without the defined substituent groups. The limitation as to the character of the X means that all compounds coming within the scope of the claims must ionize in the same manner. The claims of the patent do not, therefore, it is urged, cover a large number of compounds having widely divergent properties in the broad class designated by White, nor do they exclude previously known organic mercurials by mere arbitrary language, but are limited to a definite group and are descriptive of essential characteristics common to the group, that is, the capacity on ionization in aqueous solution of dissociating into a relatively inert anion whose specific composition is otherwise not significant and a positively charged phenylmercuric radical, and this has the important novel characteristic of a preferential affinity for the negatively charged pathogenic germs and also of combining chemically with the negatively charged chlorine ions of the body fluids to produce phenylmercuric chloride.

■ The difficulty that we have in sensing the pertinency of this challenge to the White article, whether the White disclosure be considered as an anticipation or as so advancing prior art in respect to organic mercurials for pharmacological use as to leave little room for invention, is that it would seem to us as to the court below that White so clearly pointed the way to laboratory research by which his concept was proved, that nothing more was required than routine experimentation by the skilled chemist. That being so, Weed's performance does not rise to the dignity of invention. White pointed the way he must travel, and undertaking the journey, Weed arrived at the indicated destination. There is no convincing evidence of seemingly insuperable difficulties encountered on the road, of blind alleys, and unmarked forks, of advances and retreats, of trials and failures. We do not overlook the fact that

consideration must be given to the presumption of validity that arises from the grant of the patent, but no prior art was cited against the Weed application, and insofar as invention involves questions of fact, we should, under familiar rules, sustain findings made below unless clearly wrong

■ The appellant says, however, that White solved no problems. He stated a theory and uttered a prophecy. Patents are granted for solving problems and not for stating them, and credit and reward are due not to the maker of the map but to those who travel the road and make actual discovery. Cases are cited to the effect that the publication which is asserted as anticipation must reach beyond the field of prophecy and disclose the actual invention whose novelty it is thereby sought to destroy. It is conceded, however, that of the group of compounds claimed by the patentee, which is admittedly a large one including thousands of compounds, the patentee has experimented with but 20 falling within the scope of the claims as including the effective phenylmercuric radical in the form prescribed. Since all the compounds so made and tested were found to be effective, it is concluded that all within the group likewise are. But the patent is not limited to the results achieved by the patentee's research—it covers the whole class of compounds set off from the domain described by White by the limitation incorporated into the claims. Thus the patent itself rises (or descends) to prophecy and if the White reference may not exclude Weed from monopoly of organic mercurials proved by his laboratory experimentation to be pharmacologically effective, so by the same token Weed may not exclude other investigators from research in that portion of the White domain not by him explored. The exactitude which the appellant now claims must be characteristic of a prior publication before it may be held to anticipate or limit the inventive field, must likewise be characteristic of the patented disclosure. If not, the claims are too broad and so, under familiar rules, invalid. A prophecy which will not demonstrate anticipation, will not qualify as a disclosure to sustain broad claims of a patent.

Another ground of invalidity appears. In 1931 Weed, in association with Ecker, published an article considering phenyl-mercury-nitrate as a disinfectant for seeds

and plants. Weed's first application to the patent office included the use of organic mercurials for plant and seed disinfection. He specified: "A combination of bactericidal and fungicidal properties together with similar efficiency against protozoal forms of life, with at the same time innocuousness to the human organism is accordingly all the more striking." The application was rejected on Kharasch patent No. 1,770,886, for a seed disinfectant. The reference did not include therapeutic use but Weed did not contest the action of the examiner. It would seem that if his submission then was sound his present claim to invention is but the discovery of a new use for an old compound. The analogy between the art of producing disinfectants for plants and germicides for humans was suggested by Weed himself. It would seem to require no other demonstration. The appellant concedes that if Weed's discovery is for but a new use of an old preparation, it does not disclose invention. Citations are therefore needless.

The decree below is affirmed.