**LIBBEY–OWENS–FORD GLASS CO. v.
CELANESE CORPORATION OF
AMERICA.**

No. 9144.

Circuit Court of Appeals, Sixth Circuit.

April 22, 1943.

139

George I. Haight, of Chicago, Ill. (Edwin J. Marshall, of Toledo, Ohio, Arthur C. Beaumont, of Detroit, Mich., Marshall, Melhorn, Davies, Wall & Bloch, of Toledo, Ohio, and Whittemore, Hulbert & Belknap, of Detroit, Mich., on the brief), for appellant.

Drury W. Cooper, of New York City (Clifton V. Edwards, of New York City, and Williams, Eversman & Morgan, of Toledo, Ohio, on the brief), for appellee.

Before HICKS, MARTIN, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The Celanese Corporation of America sued for infringement of its patent on safety glass by the Libbey-Owens-Ford Glass Company, and was awarded a decree and injunction, from which the glass company appeals. For convenience, the parties will hereafter be referred to as plaintiff and defendant, the capacities in which they appeared before the trial court.

Defendant contends that the patent is void for want of novelty, invention, and operativeness; that the claims in suit are indefinite; unsupported by specification; broader than the invention; and had been broadened without foundation in the application to cover defendant's manufacture, after knowledge thereof by plaintiff. It is further claimed that defendant did not infringe, and that the trial court erred in reversing the findings of fact of the Master, in disregard of the court rule providing for acceptance of such findings, unless clearly erroneous.

Plaintiff's assignor, Walsh, applied for the patent in question, No. 1,936,044, on November 24, 1928, and it was granted November 21, 1933. It is concerned with laminated glass, made by interposing a sheet of cellulose plastic between two sheets of glass and subjecting them to heat and pressure, with the effect of permanent adhesion between glass and plastic.

Cellulose is the name for the chemical substance, generally familiar in the form of cotton. A derivative of cellulose is a compound of cellulose with another substance—in this case, with certain acids. If nitric acid is added to cellulose, the reaction forms cellulose nitrate—also known as nitrocellulose or pyroxylin. If, to cellulose, acetic acid is added instead of nitric acid, the result is cellulose acetate.

Certain cellulose derivatives emerge from such acid reaction in a hard, brittle condition. If, for the purpose sought by the maker of the product, it is required that the cellulose derivatives be softer and more flexible than the case would otherwise be, various chemical substances are added to the batch of the compound during the course of manufacture. These are called plastifiers, or softeners, and are so-called non-volatile substances.

It was claimed by the patentee that, formerly, it had generally been the practice, in making laminated glass, to interpose between two glass plates, a hardened sheet of cellulose nitrate with a volatile plastifier, such as camphor, and that this hard layer was caused to adhere to the plates of glass by means of a gelatin binder. Among the disadvantages of laminated glass made by this process was said to have been the fact that because of the hardness of the cellulosic interlayer, the gelatin binder was not always able to cause it to adhere uniformly where irregularities existed. It was also stated that, because of the use of the hard sheets, such laminated glass was of irregular thickness and had irregular stresses, owing to the tendency of the cellulosic sheet not to flow sufficiently. Due to these effects from the use of such sheets as interlayers, it was set forth that changes of temperature and stresses would cause the hard layers to separate from the glass plates, resulting in flying glass and splinters when impacts caused the glass to be broken; and that cloudiness, unlaminated dry spots, and other imperfections would result.

Asserting that he had found the way to overcome the difficulties of poor welding and irregularities in hard plastic sheets, Walsh proposed, as a laminating agent, a plastic composition having "a soft consistency resembling that of a rubber-like mass" prepared from a derivative of cellulose, with sufficient non-volatile plastifier "to impart such plasticity that it will readily flow under heat and pressure." He further observed that because of the comparatively large amount of plastifier employed, the sheets were more or less permanently plastic, and that the glass and the composition were united by application of the requisite heat and pressure.

In his specifications, Walsh stated that the cellulose derivatives to be employed in making up the plastic composition, might be cellulose nitrate or organic derivatives of cellulose, such as organic esters of cellulose and cellulose ethers. As examples of organic esters, Walsh stated them to be cellulose acetate, cellulose formate, cellulose propionate, and cellulose butyrate. Examples of cellulose ethers, as given, were ethyl cellulose, methyl cellulose, and benzyl cellulose; and it was stated that a mixed ester, such as cellulose acetonitrate, might be used. He further stated that in one form of his invention, the plastic composition could be made from the following formula: cellulose nitrate (pyroxylin), 100 parts by weight; dibutyl phthalate, 50-75 parts by weight; and urea (stabilizer), one part. The other formula he disclosed was: cellulose acetate, 100 parts by weight, and 60 parts by weight of triacetin. As examples of "suitable" plastifiers, Walsh, in his specifications, gave dibutyl phthalate, diethyl phthalate, dibutyl tartrate, triacetin, tricresylphosphate, and triphenylphosphate. In his claims, Walsh sought a patent on laminated glass having sheets of glass united by a plastic composition containing a derivative of cellulose, as well as a composition having cellulose nitrate—and a plastifier from the group consisting of debutyl phthalate, diethyl phthalate, dibutyl tartrate, and triacetin. He further made like claims, based on a composition containing a derivative of cellulose and a plastifier selected from the group consisting of phthalic acid esters—as well as a composition containing cellulose acetate with plastifiers of a non-volatile alkyl phthalate; and methods of making the above compositions. The use of all of the above-named plastifiers was based on 50-75 parts by weight, to that of the cellulose derivative.

Plaintiff rests its claim of validity of the patent in question on the ground that Walsh was the first to employ, in the art, sheets of a cellulose composition, having a soft consistency resembling that of a rubber-like mass, resulting from the use of a large amount of a non-volatile plastifier; that sheets of the composition so made were more or less permanently plastic and flowed readily under heat and pressure; that certain proportions of the designated plastifiers gave this particularly desired result; that such composition sheets, under heat and pressure, adhered to the glass without the use of any other adhesive substance; and that it was novel to use such a composition as an interlayer between plates of glass to form laminated glass.

At the outset, it appears that cellulosic sheets, consisting of 100 parts of cellulose

nitrate, with 30, 40, or 45 parts of camphor as a plastifier, had been used for many years as interlayers in laminated glass. Prior to Walsh, it was old in the art to use cellulose acetate with plastifiers or softeners in order to make plastics; and the use of the plastifiers claimed in plaintiff's patent for such a purpose, had been known for many years. Furthermore, it was known that the quality of a good plastifier was that it be as little volatile as possible; that plasticity is imparted to such a composition by adding the plastifier to the cellulose acetate; and that upon this depends flexibility, elasticity, and toughness. In the plastic composition art, the Dreyfus patent, No. 1,353,-384, disclosed that pliability of cellulose acetate depended upon the quantity of plastifier used—the more plastifier, the more pliable the substance; and, proportionately, the less plastifier, the stiffer the composition.

Many years before Walsh, it was revealed that with the increase of the amount of plastifier in a composition of cellulose acetate, a rubbery substance is obtained; and a sufficient amount of triacetin added to cellulose acetate would even result in a substance resembling raw rubber. As early as 1913, it was disclosed that cellulose acetate could be used for the production of compounds similar to rubber, and that the addition of a plastifier resulted in a substance that not only had, but retained, the properties of rubber, and could easily be shaped and laminated by the application of heat.

In the Lindsay patent, No. 1,430,020 (1922), the use of tricresylphosphate as a plastifier for pyroxylin gave a composition "of a yielding flexible character like India rubber,"—and it was stated that increased flexibility was secured with proportions running all the way from 60 to 500 parts of tricresylphosphate, to 100 parts of nitrocellulose—or five times as much plastifier as cellulose derivative. Tricresylphosphate was named by Walsh in his specification of plastifiers that could be used; and pyroxylin was named also as one of the cellulose derivatives to be used with plastifiers in making the composition. While only defendant's cellulose acetate products are accused, nevertheless, the claims in plaintiff's patent are not limited to such products, but also embrace plastics made up of designated plastifiers and cellulose nitrate (pyroxylin), and other cellulose derivatives. The general action of plastifiers upon cellulose nitrate is the same as upon cellulose acetate.

Benedictus, in his patent, No. 1,182,739, used a cellulosic sheet as an interlayer for laminated glass, as did Roosevelt in patent No. 1,210,987. The Shuman patent, No. 1,-324,361, used transparent celluloid sheets, softening them by heat and conforming them to the general surface of the glass at the time that pressure was applied. Plaintiff's principal witness on the subject stated that cellulose acetate required more plastifier than cellulose nitrate. Defendant used double the amount for the acetate, as compared to the nitrate.

With regard to flowability, plasticity, and molding, claimed for the composition in plaintiff's patent, Stevens, in his patent, No. 517,987 (1894), disclosed that sufficient plastifier must be employed to give the finished product the necessary quality of plasticity under heat; that if plasticity were not desired to any great extent, a very small amount of plastifier could be employed; and that too large a proportion of plastifier would tend to make the compound flow too readily when heated. Shuman, in patent No. 1,274,205 (1918), taught that if heat and pressure were applied to two plates of glass having interposed between them a sheet of celluloid, there would be formed a "welded union"; and in patent No. 1,-324,361, Shuman stated that it was essential that the celluloid "shall be heated so as to be softened and conform to the general surface of the glass at the time that the pressure is being applied."

From the foregoing, it clearly appears that before Walsh filed his application, the properties of plastic compositions made from cellulose nitrate or cellulose acetate and their various plastifiers, were well known. Generally speaking, they were hard, stiff, brittle substances when small amounts of plastifier were used; they were soft, pliable, flexible, supple, and plastic if large amounts were used. The more plastifier that was added, the softer and more rubbery they became. It was also known that a sufficient addition of various of the plastifiers to cellulose acetate resulted in a product that not only had rubber-like properties, but also retained them after manufacture.

In addition, the properties of plastifiers were generally known. The less volatile the plastifier, the more it remained in the compound of the finished product, keeping it soft, plastic, and pliable. A plastifier of

higher volatility tended to sublime, escape, or evaporate, causing the finished plastic product to lose its soft and pliant quality and to harden and stiffen. It was known which plastifiers were more volatile than others, and it was also known that certain plastifiers would work more satisfactorily with some cellulose derivatives than with others.

All of the plastifiers mentioned by Walsh, in both his specifications and claims, had long been recognized for this peculiar quality in combination with cellulose derivatives. That such cellulose plastic compositions would, under heat and pressure, flow and conform to the surfaces of glass plates, had been established and disclosed in former patents, and early inventors had taught that the flow of the composition under such circumstances depended largely upon the amount of plastifier employed.

Plaintiff is most insistent that what was known about plastics is not to be confused with what was known about laminated glass. The laminated glass art was built on the art of cellulose plastics. Before Walsh, patents had been granted for safety glass made of two sheets of glass, with an interposed sheet of transparent cellulose nitrate or cellulose acetate. Such laminated glass had been subjected to heat and pressure, causing the cellulose sheet, whether "of celluloid or equivalent material," to be softened, shaped, and conformed to the surfaces of the glass and welded thereto.

In considering cellulose derivatives themselves—before they are compounded with plastifiers—we may mention the nature of the two derivatives that are of most importance in this case. From the evidence, it appears that cellulose nitrate generally stands up better against impact than cellulose acetate; that the acetate is more brittle, but less affected by light than the nitrate; that in comparison with the nitrate, the acetate seems to lose strength and stability as plastifier is added. However, the acetate can be subjected to high temperatures with less danger than the nitrate, but, on the other hand, is more affected by cold. The foregoing is sufficient to indicate some of the many factors to be considered in the use of one or the other of the derivatives in the fabrication of laminated glass.

With regard to the nature of plastifiers, there was a mass of substantial and persuasive evidence that many of the named plastifiers do not work with, or plastify the various cellulose derivatives designated to be used by Walsh. Dibutyl phthalate, an alkyl phthalate, is not compatible as a plastifier with cellulose acetate, and is wholly inoperative; with cellulose nitrate, it is a fairly poor plastifier in the proportions stated by Walsh, and results in the formation of a non-stable substance—although it is much better when used in considerably smaller amounts than stated in Walsh's claims. Diethyl phthalate, according to several of the expert witnesses, is a poor plastifier with acetate, "sweating" and having other disadvantages. Dipropyl phthalate is not a plastifier with cellulose acetate, and diamyl phthalate, dihexyl phthalate, and dioctyl phthalate—all phthalic acid esters—do not work with cellulose acetate. Diethyl phthalate, dibutyl tartrate, and triacetin do not plastify cellulose formate, methyl cellulose, cellulose propionate, cellulose butyrate, or benzyl cellulose, though they are all given by Walsh in his specifications, as plastifiers for the above derivatives.

Many of the substances resulting from the combination of the plastifiers and cellulose derivatives named by Walsh in his patent, and in the proportions designated by him, were hard, opaque, brittle, flaky, and unstable; some of them turned to powder when they were cut or sliced; others were thick, "cheesey," and totally unsuitable for plastics. One of plaintiff's chief expert witnesses stated that if he were to choose between the old well-known plastic made of nitrocellulose and camphor, and a plastic composition made of 100 parts of cellulose acetate and 60 parts of triacetin (the only cellulose acetate formula mentioned by Walsh in his specifications) he would choose the old plastic as superior for the purposes of the laminated glass trade, from the standpoint of strength, haze, and clarity; and such a choice was actually made by the company with which the witness had been formerly associated, when it was confronted by a like problem.

But while maintaining the superiority of the so-called soft sheets, alleged to have been made by Walsh, the witness also stated that, as far as "rubber-like mass" was concerned, there would be very little difference—and difficult to distinguish—between the lower range of Walsh's teachings, and the old camphor cellulose nitrate plastic. In fact, the same witness, when, on the hearing, he was handed two plastic sheets and asked whether he would say that

one was hard, and the other was soft, "resembling a rubber-like mass"—such being the description in the specification of plaintiff's patent—or whether both sheets were rubbery, stated, after examining and handling the sheets and scoring them with a penknife, that, while they were "not very rubbery," they were much more rubbery than the old cellulose nitrate plastic sheets used in the laminated glass trade. The fact was that both sheets were of the old type of cellulose nitrate plastic, one with a plastifier of 36 parts of camphor, and the other, with 44 parts of camphor.

While it is argued that these expressions of the witness, on such an inadequate test, should not be given weight in considering the question involved, and that it appeared that more scientific evaluation would determine the matter otherwise, nevertheless, in view of the rather indefinite but allegedly important description of plaintiff's plastic as "soft and of rubbery composition," in comparison with the "hard" sheets previously used in laminated glass, we are of the opinion that such testimony indicated that the hardness of the plastic sheets was not the problem solved, or to be solved, and that the solution of the difficulties existing in laminated glass did not depend upon softness and rubbery qualities. This is especially so, considering that the witness, after he had been advised of the composition of the sheets, stated that he had based his opinion of the softness of sheets of this type, on similar sheets he had seen.

Cellulose nitrate, plastified with camphor, had been for a long time before Walsh, described as a soft plastic; and in the early patents and literature on plastics, camphor was designated as a non-volatile plastifier. The less volatile the plastifier is, the less of it is lost during manufacture, and the less it sublimes or evaporates from the finished product. Hardness can result from lack of plastifier or from evaporation of the plastifier during or after the process of manufacture. Softness may come from large amounts of plastifier, and the less volatile it is, the more of it stays in the finished product, which as a consequence continues to remain more plastic.

With regard to the idea of conforming and molding a cellulose plastic sheet to plates of glass, this was old. Flowing and molding were described by one of plaintiff's expert witnesses as meaning the same thing; and as early as 1894, it had been known that such flow was dependent on heat and the plastifiers used.

The flowability of compounds made of the various cellulose derivatives and the plastifiers designated by Walsh, within the ranges named in his claims, extends from no flow whatever—in the case of the powdery substances produced—to various degrees, some greater than the old well-known compound of cellulose nitrate and camphor, and some less. Ryan, one of defendant's expert witnesses, stated, after discussing these various combinations, that the matter of "more flow" was of no importance as long as molding of the plastic to the glass surface was obtained, and that this quality was secured in the old type of plastic compound of cellulose nitrate and camphor. It seems evident that the problem sought to be solved by Walsh did not depend upon, nor was it achieved by, increasing flowability in the named compositions, within the ranges stated by Walsh, and as contended by the plaintiff.

We have in mind that much of the foregoing appeared from testimony of defendant's witnesses; that methods of measurement of flow were criticized; and that the interest of the witnesses was emphasized; but from our review of the record, the evidence was persuasive and would amply sustain any or all findings of fact that might be made in accordance therewith.

It was admitted by plaintiff's expert witnesses that dibutyl phthalate (one of the plastifiers named by Walsh) is not compatible and will not work with cellulose acetate; and that dibutyl phthalate and diethyl phthalate—the only two phthalates named in the patent specification—do not give the same or substantially the same results, and do not act alike in any way upon cellulose acetate. Furthermore, while there is an apparent similarity, from the chemical point of view, between diethyl phthalate—designated in the claims as the plastifier for cellulose nitrate and cellulose derivatives—and dimethyl phthalate (a plastifier used by defendant), it appears from persuasive evidence, that there is a marked difference between them when they are used as plastifiers in laminated glass; that there is a stronger affinity on the part of dimethyl phthalate for cellulose acetate, than there is on the part of diethyl phthalate; that one makes a much more satisfactory laminated glass than the other; and that used in the same proportions with cellulose acetate, dimethyl phthalate gives a softer sheet of

plastic than diethyl phthalate. According to Ryan, diethyl phthalate tends to sweat out, or exude from the finished compounds —while dimethyl phthalate does not. The evidence supported findings that, while the plastifiers named in the patent were chemically similar, there were, nevertheless, important and vital variations in the way in which the same amounts of such plastifiers reacted to the same or different cellulose derivatives. In fact, numerous compounds so made, were totally unusable as plastics in laminated glass, or, apparently, for any other purpose.

Plaintiff argues that while many compositions of the named plastifiers and derivatives may have been less satisfactory than others, the patentee specified a "suitable" plastifier; that this means the "proper" plastifier for the "particular" derivative; that from this specification, one skilled in the art would know which plastifier and which derivative to use. But it appears that although Walsh filed his application for the patent in 1928, both defendant and other companies were corresponding, negotiating, and conferring with plaintiff as late as 1930, in an attempt to secure satisfactory cellulose acetate sheets for interlayers; that in 1932, plaintiff advised defendant that up to that time, "cellulose acetate has not been perfected for laminated glass"; that the material produced by plaintiff was not satisfactory for defendant's purposes; that plaintiff's research department was still working on the matter; and that "we have not to date produced a sheet which is quite the equal of celluloid." In July, 1933, plaintiff was advising that its primary object was the development of the "proper formulation" and seasoning technique for cellulose acetate plastic; that it was then actively engaged in solving the problem of improved haze and clarity, and would submit final samples "as soon as we obtain some indication that we are working in the right direction." During these years, defendant was, in collaboration with plaintiff, conducting numerous tests and experiments on various cellulose plastic sheets, with varying proportions of plastifiers and derivatives, sent to it by plaintiff, in an effort to arrive at a solution for the right kind of interlayer; and that defendant was advising plaintiff from time to time of the defects and disadvantages in the compositions·so tested. It is difficult to draw any inferences from the foregoing, except that those skilled in the art were unable to·find from Walsh's specifications and claims, the suitable plastifiers, the particular derivatives, and the proper proportions of each for the desired composition, without multitudinous experiments.

The qualities required in a good interlayer are many, including clarity, strength, and stability. Numerous compositions have one of these qualities, but not the other. Plaintiff introduced in evidence various plastic sheets and laminated glass made from ingredients within the range of proportions of the Walsh patent; and it is true that in the vast area, bounded by the different plastifiers and derivatives, in the many varying proportions proclaimed by Walsh, plaintiff did eventually find some plastic compounds that could properly be described as of a soft and rubbery composition, and which were exceptionally suitable for laminated glass. But, were we to assume (contrary to the Master's findings) that the use of such soft plastics in laminated glass was a novel contribution to the art, we are met by the fact that the patentee has claimed a great chemical kingdom; that within the ever contracting and expanding boundaries set by him, are multiform compounds that have none of the attributes necessary for the purposes of the claimed invention; that even among many of the compositions submitted as suitable for such purposes, numerous of them failed, being discolored, with bubbles and unlaminated spots; that the most successful of the compounds are found only by continuous experimentation; but that, nevertheless, it is sought to impress a title and ownership upon anything discovered by others within the unexplored regions of this vague domain.

■ The patent statute requires that the inventor describe his product in such full, clear, concise, and exact terms as to enable any person skilled in the art to make or compound it. 35 U.S.C.A. § 33. When a patent for a new composition of matter states the proportions of the substances which are to be mixed together, ambiguously and vaguely, it is the duty of a court to declare the patent void. For in such a case, it is evident that no one could use the invention without first ascertaining from experiment the exact proportions of the various ingredients required to produce the result intended to be obtained; and if, from the nature and character of the ingredients to be used, they are not susceptible of such an exact description, the inventor is not

entitled to a patent. Wood v. Underhill et al., 5 How. 1, 12 L.Ed. 23.

■ Little need be said of the limits stated by the patentee as to the proportion of plastifier to be used. Although it is insisted that these are not to be taken as absolutely exact and that slight variations are permissible, plaintiff is confronted by file wrapper estoppel, inasmuch as the patentee, after numerous rejections in which he successively used phrases, of "sufficient" plastifier, and "at least 50 per cent" of plastifier, finally gave the proportion as "50-75%," stating that he was thereby "definitely limiting the plastifier to the percentages set out in the specific examples."

Moreover, while it is claimed that the proportions stated were critical, it appears otherwise from the evidence; and plaintiff's expert witness on the question stated that, within the range set by Walsh, determination of the sufficient amount of plastifier was a matter of experimentation; that the changes in compositions attendant upon use of plastifier above 75 per cent, are gradual, and that "there are no sharp lines where you can say, 'this sheet works and that sheet does not.' It is a matter of relative degree"; that beyond the upper range of 75 per cent stated by Walsh, one would have to be "well within 85 per cent"—and such upper limits would be "difficult to settle without actual experimentation"; that, as to the lower range of Walsh, the difference between the proportions stated by him and the old camphor and nitrate compound, was a matter of degree; and that there is merely a relative change in the various compositions, which is continuous as the amount of plastifier is increased.

■ In a patent for a composition, the component parts of the new substance claimed, should be stated with clearness and precision, and not leave a person attempting to use the discovery to find it out by experiment; Tyler v. Boston, 7 Wall. 327, 19 L.Ed. 93; and it has been held that a mere difference in the proportions of the constituents of a compound, however useful the result may be, does not entitle the inventor to the monopoly of a patent, where such a result was reached gradually by continued experimentation by the patentee and by others, all leading to the same proportions, and the final product differs from those of the prior art only in degree. Brady Brass Co. v. Ajax Metal Co., 3 Cir., 160 F. 84. The language used must be sufficiently clear and certain to enable one desiring to make the composition to determine the quantity of the components referred to. Where, because of vague and uncertain description, such a desired quantity can be determined only by experiment, the patent is void; De Lamar v. De Lamar Mining Co., 9 Cir., 117 F. 240; nor may a patentee arbitrarily select a point in progressive change and maintain a patent monopoly for all operations in such progressive change falling on one particular side of the arbitrarily selected point. The maintenance of a patent monopoly is admissible only where the selected point corresponds with physical phenomena, and the patentee has discovered the point at which such physical phenomena occur. Kwik-Set, Inc., v. Welch Grape Juice Co., 2 Cir., 86 F.2d 945. See, also, Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221.

■ It is true that a compound never mixed before may effect so startlingly new a result as to arrive at even pioneer invention, but ordinarily it is the invention of what is new, and not the attainment of comparative superiority or greater excellence in that which was already known, that amounts to patentable invention. To be patentable, a compound must not result merely from figuring out proportions different from any known before; but there must be shown new results from the new proportions developing the new compound—or an old compound with new characteristics of structure or performance. David Belais, Inc., v. Goldsmith Bros. Smelting & Refining Co., 2 Cir., 10 F.2d 673. Claims to the exclusive use of a large group of related chemical compounds, unsupported by proof that all have a common quality rendering each useful in the proportions patented, are too broad, and, therefore, claims for their exclusive use cannot be sustained. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610. In this case, there was no peculiar fitness for a great number of the plastifiers and derivatives, in the proportions named, for the particular purposes sought. There must be a common quality in respect to their effectiveness in achieving the inventive concept. Kalle & Co. v. Multazo Co. Inc., 6 Cir., 109 F.2d 321. A patent monopoly is not to be extended to the use of a class of materials, some of the members of which are shown not to be effective in carrying out the inventive process. American Chemical Paint Co. v. Fire-

146

stone Steel Products Co., 6 Cir., 117 F.2d 927; see, also, Matheson v. Campbell, 2 Cir., 78 F. 910, 911. The evidence in this case discloses that the patent was based on a hit or miss formula, which was not such a disclosure to those skilled in the plastic composition art or laminated glass art, as would enable them to practice its manufacture without experiment. See Solva Waterproof Glue Co. v. Perkins Glue Co., 7 Cir., 251 F. 64.

That the patentee turned his back on the old practice of using hard plastic sheets; that he revolutionized the industry by an invention of a new kind of laminated glass with an interlayer of a soft, rubbery mass, that flowed and yielded and absorbed shocks, at the same time adhering firmly to the glass; that this result was obtained within critical limits of 50-75 per cent of designated plastifiers and derivatives, and that the attendant softness and flowability of the plastic achieved the result,—was apparently accepted by the patent office officials, who relied upon the allegations in the patent. But the critical limits did not exist; the problem of hardness was not pivotal; and the solution of the difficulties did not depend upon the softness and flowability of the composition. As said by Judge Simons, of a patentee in like circumstances: "He stated a theory and uttered a prophecy. Patents are granted for solving problems and not for stating them, and credit and reward are due not to the maker of the map but to those who travel the road and make actual discovery." Hamilton Laboratories v. Massengill, 6 Cir., 111 F.2d 584, 587.

 On a review of the record, we are of the opinion that there was substantial and persuasive evidence to sustain findings of the Master that the three product claims in suit were invalid for want of novelty and want of disclosure.[1] The findings were not "clearly erroneous," and in such circumstances, the district court is bound to accept them. Rule 53(e) (2) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c; see Adamson v. Gilliland, 242 U.S. 350, 37 S. Ct. 169, 61 L.Ed. 356; Santa Cruz Oil Corp. v. Allbright-Nell Co., 7 Cir., 115 F.2d 604. Entry of judgment contrary thereto requires reversal.

That such claims are void because they are broader than the invention and cover many inoperative combinations is shown by the overwhelming evidence. Plaintiff's best examples of the product which it made differ from those of the prior art only in degree; and one could not achieve sought-for compositions without long and extensive experiment. The three method claims in suit fall with the others. They are founded on a way of making laminated glass with sheets of plastic composition. The method itself is impractical in the making of laminated glass, according to plaintiff's expert witness on the subject. Controlling is the fact that such method claims are limited to the use of plastic compositions, with the identical ingredients and in the proportions of the three product claims, which have been already held to be insufficiently disclosed and inoperative, and the process, therefore, lacks the further requisite of utility. See Fruit Treating Corp. et al. v. Food Machinery Corp., 5 Cir., 112 F.2d 119.

In view of our determination, it is unnecessary to discuss other questions raised in the briefs.

In accordance with the foregoing, the decree of the district court is reversed and the case is remanded for entry of a decree, dismissing the bill of complaint.

---

[1] Although incorporated in the Master's conclusions of law, the foregoing are findings of fact and are herein treated as such, with reference to the application of Rule 53 (e) (2).