TOROK

v.

WATSON, Com'r of Patents.

Civ. A. No. 5597-52.

United States District Court District of Columbia.

Aug. 3, 1954.

O. B. Buchanan, Pittsburgh, Pa., Raymond Jones, Washington, D. C., for plaintiff.

E. L. Reynolds, Sol., Samuel William Cochran, Atty., U. S. Patent Office, Washington, D. C., for defendant.

LAWS, Chief Judge.

This is a suit to obtain a patent for discovery of a product and process relating to a device known as a thermistor. At issue are claims in plaintiff's application numbered 10, 15, 20, 21, 23 and 31–34, rejected by the United States Patent Office as disclosed in prior patents, and as described in terms too broad to indicate the critical proportions of elements that must be used for the device to operate effectively, and claims 24–28, rejected as misjoined in this application.

The thermistor in its finished form is an instrument for the measurement and control of temperature. It is composed of a mixture of metal oxides in certain proportions which changes its electrical conductivity at certain specific temperatures. As electric current is passed through the semi-conductive material, changes in resistance are recorded as the temperature being measured varies. The thermistor has a high negative temperature coefficient, the semi-conductor decreasing rapidly in resistance with a small increase in temperature.

For over a century it was known that many semi-conductors are highly sensitive in resistance to small changes in temperature. However, because of the difficulty in finding a semi-conductor stable in composition and reliable in characteristics, it was only in the last thirty years that any practical application of the material was made in temperature control with satisfactory results. In 1948, when plaintiff applied for a patent, thermistors had found important uses in industry, but were restricted to measurement of temperatures below 250 or 300 degrees Centigrade, were difficult to manufacture because of extreme sensitivity to minute impurities in their composition and exposure to heat treatment in their preparation, and lacked stability

and reliability in use, at least above these temperatures.

In order to develop a semi-conductor for use as a thermistor that would be commercially practicable for control of temperatures in a broader range up to 1000 degrees Centigrade or more, that would be small, compact, durable, producible in manufacture at low cost with satisfactory uniformity, stable chemically, and consistent in response in day to day operation, plaintiff undertook a series of experiments which required a firm grasp of the highly technical art. His arduous search for an acceptable composition revealed that the silicates, the carbides, and most of the metal oxides must be discarded as unsatisfactory, and that chromic oxide alone meets the test as the only metal oxide which does not deoxidize or change to other oxides when sintered, that is when reduced to a coherent solid mass with a permanent structure by heating at temperatures of the order of 1500 degrees Centigrade.

While chromic oxide was thus found to have the most constant or reliable resistance-temperature characteristic, because of its wide variation over its effective temperature ranges it was unsuitable for temperature control at the low and high ends of the range. It was discovered that this deficiency could be remedied by the addition of a small quantity of nickel monoxide as an activator to increase the conductivity of the composition, permitting the thermistor to respond at the low ranges of temperature. Similarly, the addition to the chromic oxide of a metal oxide, preferably cobaltic oxide, which acts as a poison in decreasing the conductivity of the mixture, permits accurate measurement at the high ranges of temperature. While the addition of an oxide other than chromic oxide necessarily produces a thermistor less constant and reliable, if the diluent is kept small in quantity, in a percentage range where there is least variation in resistance as the concentration changes, desirable results may be obtained without any significant change in resistivity for commercial purposes. Plaintiff's product claims thus consist essentially of thermistors composed of chromic oxide as the main and essential ingredient in a sintered composition with another metal oxide in small quantity.

Previous patents have contained references to a thermistor material with chromic oxide as an ingredient, and for this reason plaintiff's claims were rejected by the Patent Office. Ochs patent No. 648,-518 described an electrical resistance for use as a heating device for glowers in glow-lights that might be made of metal oxides, including that of chromium, individually or in combination. The Grisdale patent No. 2,258,646 mentions chromic oxide among metal oxides which may be used for resistance material in electrical systems. The Inutsuka patents No. 2,294,755 and No. 2,294,756 discloses a mixture of chromic oxide and copper, ferric, or other oxides, for electrical resistors. The Christensen patent No. 2,-407,251 discusses a resistor made of a large number of materials, usually compounds of metals, mentioning a mixture of manganese and nickel or uranium oxides, and chromium as a conductive plating. The Siemens (French) patent No. 792,828 concerns a process for the making of resistances of an oxide composition, chromium oxide being among those named. In the English patent No. 464,274 for improvements in resistances, chromium oxide is mentioned with aluminum oxide as an insulating oxide to be mixed with niobium trioxide or vanadium trioxide.

In none of the previous patents is sintered chromic oxide considered to have special or superior qualities as a major thermistor ingredient for temperature measurement, nor is it placed in a preferred position among the metal oxides indicated as possible ingredients, except perhaps in the Inutsuka patents, which teach in contrast to plaintiff's claims that a composition with more than 40% chromic oxide is inferior in quality. Plaintiff's application is therefore not a mere restatement of claims specifically known to the prior art or identically disclosed or described in earlier patents.

 Applications for patents must be measured against the basic requirement " * * * to promote the Progress of Science and useful Arts, * * * " U.S.Const., Art. I, Sec. 8, cl. 8. The patent statutes represent the Congressional expression of this Constitutional provision, and should be construed in the light of its purpose to promote the welfare of society by encouraging and stimulating discovery and invention. The require-

ment of invention should be examined in the light of the contribution the product makes to the advancement of the arts and sciences. The statute itself makes no strict and narrow requirement of invention, but merely provides a patent shall not be granted " * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (1952 ed.).

The criterion to be applied for determining patentability of an improvement over the prior art has been stated in the case of O'Rourke Engineering Const. Co. v. McMullen, 2 Cir., 1908, 160 F. 933, 938, certiorari denied 210 U.S. 435, 28 S.Ct. 763, 52 L.Ed. 1136:

"The principal question in such cases is: Has the patentee added anything of value to the sum of human knowledge, has he made the world's work easier, cheaper and safer, would the return to the prior art be a retrogression? When the court has answered this question, or these questions, in the affirmative, the effort should be to give the inventor the just reward of the contribution he has made. The effort should increase in proportion as the contribution is valuable. Where the court has to deal with a device which has achieved undisputed success and accomplishes a result never attained before, which is new, useful and in large demand, it is generally safe to conclude that the man who made it is an inventor. The court may resort to strict and, it may even be, to harsh construction when the patentee has done nothing more than make a trivial improvement upon a well known structure which produces no new result; but it should be correspondingly liberal when convinced that the patentee's improvement is so radical as to put the old methods out of action."

See also Oliver United Filters v. Silver, 10 Cir., 1953, 206 F.2d 658, certiorari denied 346 U.S. 923, 74 S.Ct. 308, 98 L.Ed. ——.

■■ Of course, of itself there is no invention in the mere selection of a material from a class of several known to an art to be adaptable to a particular function. See Sutherland Paper Co. v. Grant Paper Box Co., 3 Cir., 1950, 183 F.2d 926, certiorari denied 340 U.S. 906, 71 S.Ct. 281, 95 L.Ed. 655. Merely carrying forward or extending the application of a known composition to an anticipated result by determining the optimum proportion of indicated ingredients to be used can be done by a laboratory technician having ordinary skill in the art. See Allen v. Coe, 1943, 77 U.S.App.D.C. 324, 135 F.2d 11. But where extraordinary skill, imaginative perception and arduous research and experiment in a highly technical art have brought forth a product highly superior in use to anything hitherto known in the art, a creation of art is accomplished. Under the circumstances, to deny there is invention because a property of the material was known to the prior art will operate to discourage invention, stultify innovation, and impede the progress of the art.

■ There is no question plaintiff's discoveries represent a substantial and significant contribution to the advancement of the art of temperature measurement and control. Counsel have stipulated that the products disclosed in the specifications possess the following properties: the ability to hold a calibration which is acceptable for temperature measurement and control, and the ability to be manufactured in quantity production, with reasonable uniformity of characteristics, and with acceptable mechanical strength and durability.

The earlier patents cited as disclosing the prior art merely indicate that chromic oxide is one of a group of metal oxides with a high negative temperature coefficient suitable for use as a resistance element in electrical circuits. None of the patents indicates the special qualities of chromic oxide as the major element in a thermistor for use in the measurement of temperature, if that use is considered at all. None indicates that chromic oxide is the only metal oxide which does not change its oxygen composition at sintering temperatures, that diluents are to be added to chromic oxide for accurate measurement at the low and high ends of the temperature range, that such diluents must be added in small quantity because less constant and reliable, at a preferred percentage where there is least

variation in resistance with a change in quantity, and that the compositions as described produce a thermistor for the measurement of temperature in a range much broader than hitherto known that is stable, reliable, retraceable, non-drifting, and commercially producible and practical. While at least as early as 1900 in Och's patent it was recognized that chromic oxide might be used individually or in combination with other metal oxides as a resistance, not until plaintiff's application was a thermistor composition indicated that would measure temperatures in so wide a range with commercial acceptability as to constitute a new and superior result.

The facts of this case are analogous to those in General Electric Co. v. Hoskins Mfg. Co., 7 Cir., 1915, 224 F. 464, involving a patent for an electric resistance element composed of an alloy consisting of more than 50% of metal having the property of nickel and cobalt and less than 50% of one of the metals in the chromium group, of great resistivity and marvelous durability. An earlier patent had made reference to the use of chromium with certain metals to make them more resistant to high temperatures. In holding that the patent had not been anticipated, the Circuit Court of Appeals for the Seventh Circuit said, 224 F. at page 471:

"It was an inventive act on Marsh's part to extricate this most valuable material from the vague generalities and speculative statements of Placet, and place it among the instrumentalities of science as an electrical resistance element * * *. Here is an element which has made commercially practicable the manufacture of a large line of electrical power using devices, greatly contributing to the comfort of mankind as well as to the rewards of business enterprise. That Marsh was entitled to a patent for the service he rendered in rescuing the alloy from obscurity and placing it in the forefront of electrical resistance ele-

ments seems clear under the authorities. He first disclosed the properties and great advantages of the chromium-nickel alloy as a resistance element. So far as the record shows these had never been suggested in any manner calculated to lead to their application to the uses set out in the patent. Marsh substituted the alloy for the ineffective and practically discarded resistance elements of the prior art. The result was such a remarkable advance upon that prior art as to turn failure into unquestioned success."

The Court concludes plaintiff's application discloses a new and useful product satisfying a recognized want and revealing so high a competence and perceptive observation and skill as not to be "obvious" in the art within the meaning of the statute, 35 U.S.C., § 103 (1952 ed.).

In rejecting plaintiff's claims, the Patent Office was of opinion they did not indicate that the minimum 50% proportion of the chromic oxide base or the percentages for the diluents specified was in fact critical, because the addition of more or less of the amounts indicated caused only a gradual increase or decrease in resistivity of the composition, varying the results in degree rather than in kind. Were this but the arbitrary selection of a point or section in a range that changes progressively, plaintiff could not claim it as his own in a patent monopoly. Libbey-Owens-Ford Glass Co. v. Celanese Corporation of America, 6 Cir., 1943, 135 F.2d 138, certiorari denied 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442; Kwik Set v. Welch Grape Juice Co., 2 Cir., 1936, 86 F.2d 945. The relation between resistance and quantity of the diluent, however, is only one of the factors to be considered in determining the thermistor composition. The composition must also be chemically stable, reliable, constant, uniform in operation and producible in manufacture. In order to attain these properties, plaintiff's specifications indicate, a minimum of 50% chromic oxide is necessary for the device to be useful commercially.

The same considerations govern in the Patent Office's rejection of plaintiff's claims as too wide in range, in particular where the diluent nickel oxide varies in composition with the chromic oxide base from ½% to 7% in quantity. The range is adapted to commercial purposes: to indicate the tolerance in manufacture at the range where there will be least variation in resistance with a change in quantity; to allow for some measure of decomposition in manufacture and use without a change in result commercially significant; and to permit variation in manufacture according to the temperatures the device is intended to measure, nickel oxide acting as an activator for reliable measurements at the low range of temperature. The Court is of opinion such variation from ½% to 7% is not so wide as to be indicative of differences in degree only.

Having concluded the proportions set forth are critically different from disclosures in the prior art of the use of the same ingredients, the Court must now determine whether plaintiff's claims are broad enough to include other elements which would make the device inoperative, or are distinctly set forth as required by statute, 35 U.S.C. § 112 (1952 ed.).

█ Claims 10 and 15 are of the Markush type, indicating the metal oxides which may be added as exchangeable diluents of the same generic group acting as activator or poison with chromic oxide. It is conceded that claim 15 is not subject to rejection for undue breadth, being composed of chromic oxide and an oxide selected from the enumerated list. The Court finds claim 10 to be of the same type, describing a thermistor composition "consisting mainly of sintered chromic oxide, with a metal-oxide added ingredient mixed therewith," selected from the enumerated group. A fair reading of the claim indicates only one of the metal oxides specified is to be added to the chromic oxide as the other ingredient, and the claim is therefore limited to two specified ingredients in a specified percentage range.

Claims 21 and 24 describe a thermistor composition of chromic oxide with not more than 7% nickel oxide (claim 21) or not more than 14% cobaltic oxide (claim 24), and are objected to as including a lower limit of diluent that would not be operative. As is pointed out in plaintiff's application, the diluent is to be added in the smallest *feasible* percentages. Obviously there would be a point below which the diluent would have no effect on the composition, the effect of the diluent decreasing with a decrease in the amount of diluent added, and the effect on reliability and constancy decreasing with an increase in the amount of diluent. It is thus implicit in the claims, and indicated in the specifications, that they do not embrace the smaller parts of 1% where the diluent would be too small for commercial control, or would produce a thermistor acting as if composed purely of chromic oxide commercially operative within the middle ranges of temperature, so that it is not necessary that the claims so state. Claims 21 and 24 therefore are not too broad as comprehending more than contemplated in the invention.

Claims 20, 23, and 30–34 describe a thermistor composition consisting substantially entirely of metal oxides, including more than 50% chromic oxide and between ½% and 7% (claim 20), 1% and 7% (claim 30), or 1% and 4% (claim 31) of nickel oxide, or not more than about 14% (claim 23), or about ½% (claim 32), or 1% (claim 33), or between 2% and 14% (claim 34) of cobaltic oxide. Such claims would permit the addition of between almost 36% and 49½% of an unspecified metal oxide to the chromic oxide and specified diluent. They would permit the addition of metal oxides which plaintiff has criticized as completely unsatisfactory in discussing the earlier patents cited by the Patent Office as disclosing the prior art, and the addition of acceptable oxides in quantities which plaintiff has indicated would be completely unsatisfactory. The claims are based upon plaintiff's reasoning that although some of the untried diluents are known to be unsatisfactory alone as thermistor ele-

ments, this does not preclude the possibility they may be usable in small percentages as diluents. This, however, is little more than speculation. Certainly the percentages indicated as permissible cannot be considered small. These claims must therefore be rejected as too broad and general to describe the composition which he claims as his discovery, and to permit a person skilled in the art to make and use the invention without experimentation to determine whether some oxides may make it inoperative.

■■ The remaining claims 25–28 are not before the Court on their merits, but were rejected by the Patent Office on the ground of misjoinder, in view of a requirement for division and election. The pertinent statute, 35 U.S.C. § 121 (1952 ed.), which enacts as law the existing practice as to division with some changes, provides: "If two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions." Although, as indicated in the Reviser's note, division is made discretionary with the Commissioner, the Court interprets the section as permitting judicial review to determine whether the inventions claimed are independent and distinct.

While the other claims are product claims defining the composition of the thermistor, claims 25–28 are method and process claims defining the method for making the composition and for applying a terminal connection to the composition body to permit its use in a circuit. Claim 25 describes the method of making the composition, including the steps of adding to the material a heat dissociable adhesive agent and a volatile deflocculating agent, mixing the wet mixture to form a heavy paste, and then a fairly well dried out slip, forming the slip into a desired shape, prefiring to drive off the adhesive and deflocculating agent, and then firing to sinter the mass. Claim 26 describes the method of applying a terminal connection, including application of a small quantity of a high melting noble metal paste to a portion of the composition, covered by high melting point noble metal foil, prefiring slowly to dry out the paste, and then finish firing to complete the bond. Claims 27 and 28 combine the steps set forth individually in claims 25 and 26 with greater particularity.

Claim 25 describes the steps which are necessary, or at least highly desirable, in the inventor's view, if thermistors are to be produced having the requisite or desirable strength, uniformity, stability and producibility. It would appear obvious the commercial utility of plaintiff's composition is rendered nugatory if no satisfactory method is indicated for manufacturing the composition, or if manufacturing methods hitherto known were unsatisfactory in producing the type of thermistor plaintiff contemplates for the purpose intended. Similarly, claim 26 is directed to the manufacture and application of a terminal that will result in a better adhering and more heat resistant terminal than previously known, according to the inventor's claim, for commercial use. Therefore, it does not seem that the claims are independent and distinct, but are necessary and interrelated parts in producing a thermistor for commercial use to promote the progress of this highly useful art. There is strong indication plaintiff's thermistor will best perform its functions and meet commercial requirements by his process of manufacture and method of application. The method and process being intimately related to the manufacture and use of a new and better product, the Court concludes claims 25–28 are not independent and distinct, and therefore not divisible.

■ Accordingly, the Court concludes that plaintiff is entitled to receive a patent for claims 10, 15, 21 and 24, but not for claims 20, 23, and 30–34. Claims 25–28 shall be considered in the same application.