PATROL VALVE CO.

v.

ROBERTSHAW–FULTON CONTROLS CO.

No. 11747.

United States Court of Appeals
Sixth Circuit.

Feb. 10, 1954.

Frank D. Eaman, Detroit, Mich., F. O. Richey, Cleveland, Ohio, F. B. Schramm, H. F. Schneider, Richey, Watts, Edgerton & McNenny, Cleveland, Ohio, on brief, for appellant.

Wm. H. Webb, Pittsburgh, Pa., Howard F. Burns, Baker, Hostetler & Petterson, Cleveland, Ohio, Morton Burden, Jr., Webb, Mackey & Burden, Pittsburgh, Pa., on brief, for appellee.

Before SIMONS, Chief Judge, and McALLISTER and MILLER, Circuit Judges.

McALLISTER, Circuit Judge.

Appellee filed a complaint in the district court asking for a declaratory judgment of invalidity and noninfringement of Patent 2,185,421 relating to a thermostatically controlled "pilot cutoff" valve for use on gas burning appliances. Appellant, the owner of the patent by assignment from the joint inventors, denied that the patent was invalid and, by way of counterclaim, charged appellee with infringement and with violation of a license agreement for which it sought recovery of damages and royalties. The district court referred the case to a special master to hear and consider the evidence pertaining to the issues, and to report his findings of fact and conclusions of law. After conducting the hearing, the master filed with the district court a detailed report of 124 pages on all phases and issues of the case, concluded the patent in suit was invalid for want of invention; and that, in case it were valid, certain claims in issue were infringed, and others were not. The district court reviewed the findings of fact and conclusions of law of the special master and, proceeding to render an independent judgment on the issues raised in the case in what may be termed a rather comprehensive opinion considering the scope, detail, and content of the special master's report, held that the patent was invalid for lack of invention. Robertshaw-Fulton Controls Co. v. Patrol Valve Co., D.C., 106 F.Supp. 427. From this judgment, the Patrol Valve Company appeals.

It is not the policy or practice of this court, in reviewing cases on appeal where a district court has rendered a comprehensive opinion with which we find ourselves in full agreement, to re-

write such an opinion and, in a sense, to deprive the trial court of the credit of its careful consideration of the issues and arguments, and complete determination of the cause; and this is so particularly where a special master has also made a detailed report and findings of fact and conclusions of law with which the district court, as well as this court, agrees. In the present case, an exception is made by abstracting most of what hereafter follows from the report of the special master, since the facts are of controlling importance and nowhere appear except in the transcript of the record. While the case might well be disposed of upon the opinion of the district court, we are of the view that a more satisfactory determination of the appeal should encompass a recital of the facts as found.

■■ The patent in suit relates to a valve device for automatically shutting off the supply of gas to an appliance in the event the pilot light is extinguished, thus preventing injuries due to gas explosions or asphyxiation. The patentees stated that their valve could be adjusted so as to close upon the increase of heat, thus making it suitable for use in an oven regulator; and the accused devices are oven regulators. Further describing the patent briefly, it discloses a thermostatic device consisting of a combination of an expansible metal bellows connected to a flexible metal tube ending in a solid tip. The bellows and tube contain chlorinated diphenyl or chlorinated diphenyl oxide, which are thermosensitive fluids that expand on heating. The evidence clearly discloses that such thermostatic devices combining a bulb or tip, a tube, an expansible bellows containing an expansible fluid, and means actuated by the thermoexpansion of the oven, were well known prior to the time that the patentees commenced their work eventuating in the patent in suit, and, consequently, supported the finding that the construction of the device was old. Any invention that might exist would reside in the use of the above thermoresponsive fluids—a chlorinated di-phenyl or a chlorinated diphenyl oxide—which the patentees claim they found peculiarly adapted for high temperature work; and it is emphasized that a fluid that would work with high temperatures was the sought-for element.

In outlining the facts, it may be said, first of all, that the requirements of a thermoresponsive fluid or filler for such a high temperature thermostatic device were known. It appears that the patentees, in their work leading up to the issuance of the patent, were attempting to solve a problem, as presented to them by the president of the Patrol Company, appellant herein, to which the patent was afterward assigned. The problem, as stated, was to provide for a thermostatic device consisting of a bulb, tube, and bellows, and a thermoresponsive fluid which would cooperate and function with that type of device and would not decompose at temperatures up to 650° F., or attack and destroy the metal of the container. In selecting the desired thermoresponsive fluid, the patentees, in their experiments, set up a large number of cut-off valves like those illustrated in the patent in suit, on test racks in the laboratories of appellant company and at the Case Institute of Applied Science; and from their own knowledge, as well as the information they gleaned from books on chemistry and other literature on the subject, proceeded to choose certain liquids which, because of their high boiling temperatures, low freezing points, chemical stability, and other properties and characteristics, appeared to show promise of meeting the desired requirements. These compounds were given a great number of tests to determine their chemical stability in the presence of different metals, and to determine whether they possessed the required characteristics for successful use in the operation of a high temperature thermostatic device of the liquid expansion type. Many liquid chemical substances were tested to secure one having the requisite qualities. Among such chemicals were aniline, diphenyl oxide, xylene, toluene, and

orthodichlorbenzine; and of these, the three latter substances were found to possess the quality of being chemically stable at high temperatures in the presence of such metals as nickel and copper, and were found very satisfactory for high temperature work in devices such as those in suit. The patentees also tested a certain chlorinated diphenyl and a chlorinated diphenyl oxide—the subjects of the chief controversy in this case—which were, at the time, well known chemical compounds, and commercially available materials. In fact, one of the patentees, some seven years before the application was filed for the patent in suit, during certain research work which he was performing for the Dow Chemical Company, developed diphenyl oxide as a heat transfer agent for use in power plant boilers where temperatures reach 700° F. From his work and experience as a chemist, one of the patentees knew that diphenyl oxide was a very stable material; and he also was aware of the fact that chlorinated compounds such as orthodichlorbenzine had a high degree of stability in the presence of metals such as nickel and copper. He also knew that by chlorinating diphenyl oxide to produce a chlorinated diphenyl oxide, this general stability in the presence of such metals would extend to the latter compound. Moreover, he was issued a patent on the process of making chlorinated diphenyl oxide, and knew the general physical and chemical properties of such compounds. As a result of the laboratory experiments and tests conducted some years before the application for the patent in suit, he found that chlorinated diphenyls and chlorinated diphenyl oxides possessed the desirable characteristics sought for use in high temperature thermostats. As heretofore said, thermostatic devices comprising bulb, tube, bellows, and thermoexpansive liquid and means actuated by such expansion of the liquid, were old; the chemical compounds in question and their properties were well known when the patentees first commenced their work to find the desired substance; and the requirements of a filler for such devices capable of withstanding temperatures up to 700° F. were well known. The fact that it required extensive experiments and tests of the kind conducted by the patentees to determine the qualities of the chlorinated diphenyls and the chlorinated diphenyl oxides for use in thermostatic devices, from the standpoint of stability and ability to cooperate with the other elements of the compounds without decomposition or corrosion, and the discovery that the chemical compounds in question were peculiarly adapted for high temperature work and possessed desirable qualities for use in high temperature thermostats, are not sufficient to sustain the validity of the patent; for the following of routine procedures in selecting known chemical compounds, with well known properties, to meet certain requirements, as did the patentees in this suit, did not involve invention. Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 65 S. Ct. 1143, 89 L.Ed. 1644; Mandel Brothers, Inc., v. Wallace, 335 U.S. 291, 69 S. Ct. 73, 93 L.Ed. 12.

Appellant, however, contends that although all of the elements of the patent were old, the combination is new, and, therefore, constitutes patentable invention, since it produced a new result, an improved old result, or a new mode of operation. As stated in the findings of the special master, sustained by the district court, the fact that the patentees brought a chlorinated diphenyl or a chlorinated diphenyl oxide together in combination with the other elements in the device does not impart, either to those materials or to the other elements of such combination, any additional or different properties or characteristics not inherently possessed by the several elements themselves; for the elements in combination did not acquire any increased chemical stability, a higher boiling temperature, or some other and different property or characteristic not possessed by such materials out of the combination. None of the several old

elements of the patented combination took on a new quality or function by virtue of being brought into concert, nor did any such element perform any additional or different function in the combination than it was known to perform out of it. The properties and characteristics inherently possessed by the several elements remained unchanged in the combination, and no unusual or surprising consequence of either a chemical or mechanical nature resulted from the unification. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162; McCord Corp. v. Beacon Auto Radiator Co., Inc., 1 Cir., 193 F.2d 985; Packwood v. Briggs & Stratton Corp., 3 Cir., 195 F.2d 971.

Moreover, while the mechanical means used were different than in former devices, the use of a chlorinated diphenyl or a chlorinated diphenyl oxide in thermostatic devices produced no new mode of operation, since the mode, or method, of operation of the patented device was no different from that of other thermostatic devices disclosed in the prior art which functioned by means of the thermoexpansion of a liquid to create power to do work, such as to open or close a valve or move a pointer or indicator across a dial face in the same manner as, for instance, the prior known mercury-filled thermostats, or xylene-filled thermostats had operated. Nor did the combination produce such new or improved results as can form the basis of a patent monopoly; for, in the design of thermostatic devices of the liquid expansion type, the necessity for selecting a liquid filler which would not decompose or vaporize, and which would not corrode the metal of the device within the range of temperatures which it was designed to regulate and control, was well understood and recognized by persons skilled in the art prior to the commencement of the work leading up to the issuance of the patent in this case; and, while the device of the patent in suit may accomplish such results better than certain of the prior art devices, the improvement would be in degree only, for the same results were accomplished prior to the issuance of the patent in suit by devices containing fillers other than chlorinated diphenyls or chlorinated diphenyl oxides, such as xylene, toluene, and orthodichlorbenzine, in addition to the mercury already mentioned; and the bringing of such known elements as a chlorinated diphenyl or a chlorinated diphenyl oxide into the combination would not give rise to invention. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra; General Motors Corp. v. Estate Stove Co., 6 Cir., 201 F.2d 645.

Further, the findings of the special master, sustained by the district court, were to the effect that the substitution of a chlorinated diphenyl or a chlorinated diphenyl oxide for one of the several fillers previously used in the type of device in question was merely the improvement of one element of an old combination, the construction and operation of which was otherwise unchanged. As previously stated, such substitution of materials did not affect the functions of the other old elements of the patented combination or change the mode of operation and results. It did not make a new combination, and since the claims in suit, therefore, cover elements of an exhausted combination, they are invalid. Bassick Manufacturing Co. v. R. M. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251; Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U. S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; Timken-Detroit Axle Co. v. Cleveland Steel Products Corp., 6 Cir., 148 F.2d 267.

In addition to the foregoing, we are of the opinion that the claims of the patent in suit are invalid for the reason that the patentees do not particularly point out and distinctly claim the part, improvement, or combination which they claim as their invention or discovery, as required by the controlling statute, R. S. § 4888, 35 U.S.C.A. § 33.[1]

---

1. Now 35 U.S.C.A. §§ 111, 112.

With respect to the thermoresponsive element or filler of the combination, the claims in this regard encompass materials which do not respond to the requirements of the specifications, and are inoperative in the patented device. The patent states that it is for a combination of elements comprising the container, the thermoexpansive element or filler within the container, and means actuated by the thermoexpansion of the filler. All of the claims are substantially similar, except for disclosure of the filler. These claims, in order, call for: a fluid consisting of one of the halogenated diphenyls; a filler comprising one of the chlorinated diphenyls; a filler comprising chlorinated diphenyl; a filler comprising chlorinated diphenyl oxide; a filler of liquid chlorinated diphenyl oxide; and a filler of liquid chlorinated diphenyl.

Diphenyl belongs to a class of organic chemical compounds which contain carbon and hydrogen, known as hydrocarbons. A halogenated diphenyl refers to a diphenyl in which one or more of the hydrogen atoms has been replaced by one or more atoms of any one of the four halogens—chlorine, bromine, iodine, and fluorine—or which contains more than one of such halogens. There are a great many halogenated diphenyls. A chlorinated diphenyl refers to a diphenyl in which one or more of the hydrogen atoms has been replaced by the halogen chlorine; and chlorinated diphenyl includes a number of pure compounds and many complex mixtures. The appearance of these substances at room temperature ranges from a thin oily liquid to a highly viscous liquid, and from a semi-solid to a solid material, depending on the degree or percentage of chlorination.

Diphenyl oxide belongs to that class of organic chemical compounds known as ethers; and a chlorinated diphenyl oxide refers to a diphenyl ether into which the halogen, chlorine, has been introduced. There are also a large number of these compounds which range from a liquid to a solid material at room temperature, depending on the degree or percentage of chlorination.

The evidence clearly discloses that, although halogenated diphenyls and chlorinated diphenyl oxides have certain qualities in common, not all of the materials which come under the broad classifications specified in the claims are operative in thermostatic devices described by the patent in suit. Even though appellant's contention be accepted that solid chlorinated diphenyls or chlorinated diphenyl oxides should be excluded from the claims on the ground that, as qualified and limited by the specifications, the materials claimed in the patent must be liquid and remain liquid throughout the temperature range contemplated by the patent, it still appears that the claims include fillers which do not meet the requirements of the specifications, and will not operate satisfactorily in the devices in question. For within the broad classification of materials disclosed in the claims are liquid chlorinated diphenyls and chlorinated diphenyl oxides that are wholly unsuitable for effective use in thermostatic devices because they are too viscous, or indicate a lack of uniformity in responding to temperature changes, as well as a tendency to form crystals or to decompose, any one of such tendencies making such materials unsuitable for use in thermostatic devices. None of the claims recited, nor do the specifications disclose, which of the many different halogenated diphenyls, chlorinated diphenyls, or chlorinated diphenyl oxides, included in the broad classification of those materials, possess the proper physical characteristics for effective practical use in thermostatic devices, or possess the quality of remaining liquid throughout the entire range of operation contemplated by the patent. If a person skilled in the art were to determine which of the particular types of chemical compounds claimed are suitable for use as fillers in the patented devices, further experimentation is re-

quired. Moreover, it is to be said that, although claims must be read and construed in the light of the specifications and so liberally interpreted as to uphold and not destroy the right of the inventor in the substance of his invention, it is not permitted to read into the claims limitations or qualifications not disclosed in the patent in order to narrow it and save such claims where it appears that the inventor sought a broader monopoly than justified by his invention as he described it. Aluminum Co. of America v. Thompson Products, Inc., 6 Cir., 122 F.2d 796; Kalle & Co. v. Multazo Co., Inc., 6 Cir., 109 F.2d 321; Libbey-Owens-Ford Glass Co. v. Celanese Corp. of America, 6 Cir., 135 F.2d 138.

The findings of the special master, sustained by the district court, that the claims of the patent encompassed inoperative materials and were, therefore, invalid as overclaiming the alleged invention, and that they did not describe the claimed invention in the terms required by the statute so as to enable a person skilled in the art to construct and practice the invention, are supported by substantial and persuasive evidence, and on no ground could be said to be clearly erroneous; and the findings of fact by the master must be accepted by the court, unless they are clearly erroneous. Rule 53(e), Rules of Civil Procedure, 28 U.S.C.A.

Various other issues not here discussed were resolved in favor of the appellee by the special master, and such findings and conclusions were sustained by the district court. We have considered the detailed findings and conclusions of the special master and the opinion of the district court; none of these findings is clearly erroneous; they are amply sustained by the evidence and were we to proceed to an independent judgment on the evidence, we would be entirely in accord with such findings; and no error of law appearing, the judgment of the district court is affirmed in accordance with the opinion of Judge Jones.