**PEMCO PRODUCTS, Inc., Plaintiff,**

v.

**GENERAL MILLS, Inc., Defendant.**

**Civ. No. 7357.**

United States District Court
N. D. Ohio, W. D.

Sept. 27, 1957.

**434**

———◆———

Charles O. Marshall, Jr., Toledo, Ohio, Blackmar, Swanson, Midgley, Jones & Eager, Kansas City, Mo., Cameron, Kerkam & Sutton, Washington, D. C., for plaintiff.

Carl F. Schaffer, Toledo, Ohio, Merriam & Lorch, Chicago, Ill., for defendant.

KLOEB, District Judge.

This is an action for the infringement of United States Letters ·Patent No. 2,-696,455.

Application for the patent was filed by Harry E. Blair, Assignor to Pemco Products, Inc., on May 19, 1952, and the patent was granted on December 7, 1954.

The specification recites in part the following:

"The present invention relates to the control of large roundworm infections of poultry and domestic animals. More particularly, it relates to veterinary therapeutic agents for the control of large roundworm infections of poultry and domestic animals comprising an orally ingestible, non-toxic substance having dispersed therein, as an active ingredient, a cadmium compound. * * *

\* \* \* \* \* \*

"The effectiveness of my compositions is believed to be due to the cadmium portion of the various compounds, * * *.

\* \* \* \* \* \*

"Since the anthelmintic activity of my compositions is essentially due to the cadmium portion of the various compounds employed, my invention has a considerable amount of flexibility and permits the use of a wide variety of cadmium compounds. I prefer to employ those cadmium compounds that are readily available and less expensive in as much as economy is one of the important factors affecting the usefulness of my compositions.

"Thus, in the preparation of my medicated feed compositions, I prefer to use the cadmium compounds such as cadmium oxide, cadmium chloride, cadmium bromide or cadmium sulfate because of their cheapness and their availability. It is desired to emphasize, however, that I can employ any cadmium compound which can be used to provide an effective concentration of cadmium without producing a toxic effect. Among such cadmium compounds are cadmium pentachlorophenate, cadmium naphthenate, cadmium ortho-phenylphenate, cadmium carbonate, cadmium hydroxide, cadmium orthophosphate, cadmium silicate, cadmium chloro-ortho-phenylphenate, cadmium 2, 4–dichloro-ortho-phenylphenate, cadmium acetate, cadmium ammonium fluoride, cadmium arsenate, cadmium borate, cadmium chlorophosphate, cadmium fluoride, cadmium fluosilicate, cadmium metaphosphate, cadmium nitrate, cadmium oxalate, cadmium perchloriate, cadmium phosphate, cadmium sulfide, cadmium sodium chloride, cadmium stannate, cadmium iodide, cadmium stearate, cadmium salicylate, and the like. \* \* \* ".

Set forth in the specifications are twenty-one examples of methods for preparing the therapeutic agents. Examples 2, 6, 7 and 8 recommend a mixture of cadmium chloride with the feed. All of the other examples recommend a mixture of cadmium oxide with the feed. At the conclusion of the examples, we find the following:

"In the foregoing examples, the particular cadmium compounds employed may be replaced by an equivalent quantity of any one or combination of the cadmium compounds mentioned previously as being suita-

ble for use in my veterinary therapeutic feed compositions.

\* \* \* \* \* \*

"The cadmium concentrations in my swine feed mixtures have been varied from 0.003% to about 0.1%. \* \* \* ".

There are ten claims in the patent. By agreement of counsel, plaintiff relies upon claims 2, 7 and 9.

Claim 2 reads as follows:

"A composition for controlling large roundworm infections in swine comprising a grain-based swine feed containing a cadmium compound in a quantity to provide a cadmium concentration of from about 0.003% to about 0.04%."

Claim 7 reads as follows:

"A process for killing large roundworms in domestic meat-producing animals infected therewith which comprises contacting the roundworms with a cadmium compound by feeding said animals over a period of at least 24 hours, but not over a period sufficient to produce serious toxic effects to the animals, a domestic animal feed containing a cadmium compound in a quantity to provide a cadmium concentration of at least 0.003% based on the weight of the feed."

Claim 9 reads as follows:

"A process for killing large roundworms in swine infected therewith which comprises contacting the roundworms with a cadmium compound by feeding said swine over a period of at least 24 hours, but not over a period sufficient to produce serious toxic effects to the swine, a swine feed containing a cadmium compound in a quantity to provide a cadmium concentration of about 0.015%."

Claims 3, 4, 5, 6, 8 and 10 are either composition claims or process claims involving the use of cadmium oxide in some of the claims and cadmium chloride in others of the claims. It will be noted that the claims relied upon are not spe-cific as to the use of either cadmium oxide or cadmium chloride but advocate the use of a "cadmium compound".

In the answer, among other things, defendant sets up the defense of:

1. Non-infringement, and
2. Invalidity.

Invalidity is alleged because of:

1. Anticipation;
2. Misconduct and misrepresentation in the prosecution of the application;
3. Misuse of the patent; and
4. That the claims to the exclusive use of a large group of related chemicals, without supporting proof that all have a common quality rendering each useful in the proportions patented, are too broad, and are, therefore, invalid.

Section 282, Title 35 U.S.C.A., provides in part as follows:

"A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it."

■ The defendant has the burden of proof where the defense of invalidity of the patent is asserted, and it has been said that the presumption of validity can be overcome only by clear and satisfactory proof, or proof of such character as to leave no room for doubt. (Walker, Volume 2, page 1273.) The controversy here centers about the claim of infringement asserted by the plaintiff and the claim of invalidity asserted by the defendant. Since an invalid patent cannot be infringed, we shall first consider the issue of the invalidity of the patent and the several claims thereof in suit.

At the inception, it might be well for us to become acquainted with Webster's definition of the words "cadmium" and "anthelmintic", because we deal with these words throughout. Webster gives us the following:

"*cadmium (kadmium)*—A tin-white, malleable, ductile metal, capable of a high polish, and emitting a crackling sound when bent. Melting point about 320° C., 608° F. Boiling point about 778° C., 1432° F.

Smybol, Cd. Atomic weight, 112.4. Cadmium occurs in the rather rare mineral greenockite (CdS) and also in small amounts in ores of zinc, from which metal it is separated by fractional distillation. It was discovered by Stromeyer in 1817. It is used in making fusible alloys and an amalgam for filling teeth, and in electroplating. Chemically, cadmium is bivalent, forming but one oxide, CdO (of characteristic brown color), a basic hydroxide. It is soluble in dilute acids, and when heated in air it burns, yielding the oxide. All its soluble compounds are poisonous."

"*anthelmintic*—expelling or destroying intestinal worms."

### Anticipation.

█ It is the contention of the defendant that the discovery of Dr. Blair is anticipated by what is known as the "Schaeffer Patent", the "Wilson Publications" and the "Guthrie Experiments".

The Schaeffer Patent (Defendant's Exhibit C) deals with the elimination of gapeworms from the trachea of birds by causing the birds to breathe a dust consisting of a soluble antimonyl tartrate. This patent does not teach that roundworms can be eliminated from the intestines of swine by incorporating a cadmium compound in the feed.

We are of the opinion that the Schaeffer Patent does not anticipate the Blair Patent.

The Wilson Publications disclose that rats were poisoned when a cadmium compound was incorporated in their diet. There is no suggestion that roundworms in swine can be eliminated without harming the swine by the use of a cadmium compound.

We are of the opinion that the Wilson Publications do not anticipate the Blair Patent.

Dr. James E. Guthrie, who was employed as a Director of Research in charge of large animals by Hess and Clark, Inc., who are defending this action, conducted experiments from the years 1942 through 1949 for the purpose of finding a solution for the cure of poultry infected with tapeworms.

We are of the opinion that these experiments in which various compounds were used on tapeworms in chickens do not anticipate the Blair Patent involving the control of roundworms in swine with the use of a cadmium compound.

We conclude that the defendant has failed to sustain its burden of proof of alleged anticipation.

### Misconduct and Misrepresentation in the Prosecution of the Application.

█ The misconduct alleged centers about alleged misrepresentations by Dr. Burch and Mr. Lee in certain affidavits filed by them during the prosecution of the application.

The defendant does not contend that there was any trickery involved but, on the other hand, takes the position that the representations might have been innocent but that they were untrue.

Prior to the middle of the month of October, 1951, Dr. Blair, a Veterinarian employed by the Pitman-Moore Co., a division of Allied Laboratories, Inc., which is the parent company of plaintiff herein, conducted extensive tests with three cadmium compounds, first, a compound known as "P–171", which is the cadmium salt of PT–70; second, he conducted experiments with cadmium oxide and, third, with cadmium chloride. Cadmium compound P–171 is a cadmium salt of an organic acid. Cadmium oxide is a cadmium salt of an inorganic acid. Cadmium chloride is a soluble inorganic salt.

In late October, 1951, Dr. Blair left the employ of the Pitman-Moore Co., but before retiring he acquainted Dr. Burch with the results of the tests that he had been conducting with these three cadmium compounds. Plaintiff's Exhibit 8 is illustrative of the conclusions of Dr. Blair arrived at from his tests with cadmium compound P–171.

In the interim, from the retirement of Dr. Blair and the filing of the patent application on May 19, 1952, Dr. Burch conducted some experiments with cadmium oxide, as illustrated by Plaintiff's Exhibit 9.

It appears that, from the date of the retirement of Dr. Blair from his employment, he never thereafter conducted experiments on swine with cadmium compounds and particularly with P–171 and the cadmium oxide and the cadmium chloride.

The patent in question issued on December 7, 1954, but prior thereto, on May 14, 1953, Dr. Burch executed his affidavit (Plaintiff's Exhibit 15) to be used in the prosecution of the patent. The affidavit concludes as follows:

"That on the basis of the data shown in the above investigations, it is his opinion that the cadmium containing compositions claimed in the above-identified application are safe, effective and reliable for the treatment of large roundworm infections of poultry and domestic animals."

Attached to Dr. Burch's affidavit were reports showing all the data which had been obtained in his investigations and particularly with his tests involving the three cadmium compounds aforementioned. The affidavit states that, on the basis of the data shown in the above investigations, the cadmium containing compositions were safe, effective and reliable for the treatment of large roundworm infections of poultry and domestic animals. This was the opinion of Dr. Burch. We do not look upon it as a misrepresentation as alleged by the defendant.

It appears that Mr. Lee, who was a Director of Research as well as an Attorney for the Pitman-Moore Co., attached some remarks in the amendment to the application for the patent filed on July 20, 1954 (Plaintiff's Exhibit 15), and it is alleged by the defendant that he made an incorrect statement as to what was disclosed in a Wilson Publication. We do not consider this a material representation that misled the Patent Examiner because the Patent Examiner had before him the Wilson Publication that Mr. Lee adverted to.

We are of the opinion that the defendant has failed to sustain its burden of proof on alleged misconduct and misrepresentation in the prosecution of the application for the patent.

### Misuse.

We find no ground for alleging misuse of the patent after issuance. It appears that initially plaintiff licensed the Ralston Purina Co. (Plaintiff's Exhibit 18–A) to serve as a pioneer in advertising, selling and distributing a hog feed compound using plaintiff's cadmium oxide. In return for its pioneer work in this field, plaintiff grants to the Ralston Purina Co. a license at a lesser cost than is charged thirty-two other licensees who also are feed manufacturers. The licensees appear to be free to buy the cadmium material from any source they choose or to produce such material themselves.

We find no ground for sustaining the contention of the defendant that there has been a misuse of the patent by plaintiff.

### Defense That the Claims in Suit Are Too Broad.

It is defendant's position that the claims in suit are invalid because, while only three cadmium compounds were tested by Dr. Blair or plaintiff, the patent attempts to cover all of thousands of cadmium compounds which are alleged to exist, or which may be invented or discovered hereafter; that the patent seeks to impress a title and ownership upon anything discovered by others within the unexplored regions of this vague domain, and that no one could have predicted what the compounds in this unexplored area would do and actually may turn out to be unsafe or unreliable. In this connection, defendant relies primarily upon Libbey-Owens-Ford Glass Co. v. Celanese Corp., 6 Cir., 1943, 135 F.2d 138. It is plaintiff's position in connection with this claim of defendant that

claims 2, 7 and 9 of the patent in suit are commensurate in scope with Dr. Blair's discovery of the good results which can be obtained by the use in swine feed of cadmium regardless of what cadmium compound is used to provide the cadmium; that the term "a cadmium compound" in claims 2, 7 and 9 is simple and clear cut and is not a vague term or a hit or miss formula and that, therefore, Libbey-Owens-Ford Glass Co. v. Celanese Corp. is not applicable to the present case.

As we have heretofore pointed out, Dr. Blair's work was confined to the three cadmium compounds and up to the time that his deposition was taken on November 3, 1955 (Defendant's Exhibit A) he never experimented with any other cadmium compound and hence was wholly unacquainted with the fact as to whether any of the many cadmium compounds, and including those enumerated in the specifications of the patent, were safe, effective, reliable and palatable to swine when mixed with their feed in the proportions recommended in the claims in suit. On page 100 and page 101 of his deposition, we find these questions and answers:

"Q. Then in 1951, by August, did you know whether any other cadmium compound would be effective? A. I can't answer that for sure, not being able to find a date on the cadmium salt of 3 methyl 4 chlorophenol.

"Q. Well, let me ask it in this way: As of today, what cadmium salts do you know that are effective against ascarid in hogs? A. From my own personal knowledge of my own work, I would say three and possibly four.

"Q. What are those? A. Your cadmium salt of PT–70, cadmium oxide, and cadmium chloride, and the possibility of this 3 methyl and 4 chlorophenol.

"Q. Now, did anybody do any work for you as a result of which you learned of other cadmium salts that might be effective? A. Nobody did any work for me to determine this.

"Q. Well, let me say for or on your behalf. A. No, I don't recall any.

"Q. Are you able to state today that all cadmium compounds would be effective for the control of ascarids in hogs? A. I wouldn't be able to say that definitely, no.

"Q. Do you know whether, for example, cadmium sulfide is effective? A. I wouldn't know.

"Q. What do you know now about the cadmium compounds which can be used without toxicity on hogs? Do you know which ones, if any, would be toxic and which ones are not toxic? A. In the optimum effective dose, these three and possibly the fourth, I would say, would be all right.

"Q. And beyond that you don't know? A. I have no way of knowing beyond that."

After Dr. Blair had left the employ of Pitman-Moore and Dr. Burch had become acquainted with the previous work of Dr. Blair, Dr. Burch made some experiments with the compounds cadmium oxide and cadmium chloride. On page 113 of the record, we find the following:

"Q. By the time that the patent issued on December 7, 1954, the only cadmium compounds which you had actually tested were the oxide and the chloride, were they not? A. Yes, sir."

It appears that thereafter, and particularly in December of 1955, Dr. Burch started a series of experiments with additional cadmium compounds, and the results of those experiments are recorded on Plaintiff's Exhibit 10, wherein it is shown that twelve tests were conducted with eleven cadmium compounds, two of the tests being made with the compound cadmium chloride.

Before this action was filed, Dr. James E. Guthrie conducted certain screen tests of cadmium compounds, and the results

of these tests are shown on Plaintiff's Exhibit 23, and later the results of very extensive tests conducted by Dr. Guthrie were recorded as shown on Defendant's Exhibits N and O. On page 283 and page 284 of the record, we find the following questions and answers:

"Q. Dr. Guthrie, after your work on the chickens, which ceased as I understand it because of your allergy, was there later a time when you did work with cadmium compounds on any other animal? A. Yes, sir.

"Q. And when was that work done, approximately? A. That work began in October of 1952, I believe.

"Q. At that time had you heard anything about any work with cadmium being done by Pitman-Moore or Dr. Blair? A. I had not.

"Q. Was your work on cadmium compounds carried on at Hess & Clark? A. Yes.

"Q. What cadmium compounds did you test? A. I tested a number of cadmium compounds, some organic compounds and inorganic compounds. I have a list of the compounds.

"Q. As a result of your tests did you select one of those compounds? A. I did.

"Q. What compound was that? A. 2, amino benzoic acid cadmium salt, otherwise known as cadmium anthranilate.

"Q. Why did you select that? A. I selected that after tests on other compounds because of the fact that it was a chelated compound, and by that I mean it is a compound in which the molecular structure is such that the metal is more tightly held than it is in other types of compounds such as the inorganic.

"Q. By 'tightly held' what do you mean? A. By that I mean that the metal does not become available in solution in an acid medium as rapidly as it does from a so-called non-chelated compound.

"Q. What in your work was it that indicated to you that the cadmium anthranilate did not become available as rapidly or as readily as the other cadmium compounds? A. Well, for instance, we have administered the 0.66 percent of the drug to an animal, one animal, for days, four days, that is, and there was no vomiting. This indicated to me that the cadmium was less available than it was in some of the other cadmium compounds."

On page 320 of the record, we find the following in the testimony of Dr. Guthrie:

"Q. In other words, these cadmium compounds vary, some of them differ from others in toxicity, is that true? A. Yes.

"Q. And some are different from others in effectiveness? A. Yes.

"Q. Now, Dr. Guthrie, referring to Exhibit O, and confining yourself for the moment to the first four pages and excluding cadmium fluoacetate, is that,—is it true that substantially all of the ill effects noted on the first four pages of this exhibit could be accounted for by lack of palatability causing the hog to eat less than the normal amount of feed and thus lose weight? A. In the majority of cases I believe that is correct. However, where these animals weighed 13 pounds less than they did at the initiation of treatment and the treatment extended for only three days, that is a considerable weight loss and I don't believe it can be accounted for wholly on the basis of unpalatability."

As the result of the experiments of Drs. Blair, Burch and Guthrie, as shown on the exhibits heretofore mentioned, it is indicated that a number of the cadmium compounds tested, and including the oxide and the chloride tested by Dr. Blair, appear to be fairly effective for killing roundworms and to do so without killing the swine. A number of the cadmium compounds experimented with

prove to be toxic to the animal experimented on, causing it to refuse to eat or to lose weight or even to die, as was the case in the experiments with cadmium fluoacetate. So that, as a result of these experiments, it appears that the effects from the use of a number of these compounds are far from being uniform, safe or effective for deworming purposes on swine. In this connection, it is important to bear in mind that a certain tissue residue is left in the animal after the use of a cadmium compound in its feed. The extent of this tissue residue might vary with the different compounds used and might well be harmful to humans who consume the flesh of the animal. On pages 41 and 42 of the record, we find in the testimony of Dr. R. E. Bradley, who teaches veterinary parasitology at the College of Veterinary Medicine at the University of Illinois, the following questions and answers:

"Q. What cadmium compounds do you mention to your students. A. Well, we mention two that are marketed commercially.

"Q. Which ones? A. Cadmium anthranilate and cadmium oxide.

"Q. And you mentioned a newer compound is piperazine? A. Yes, sir.

"Q. How effective is that? A. Here, again, it is hard to say.

"Q. What do you tell your students about that? A. We tell them that piperazine is an effective drug.

"Q. Do you refer to the cadmium compounds? A. Sometimes, yes.

"Q. What do you say in comparison? A. Well, we say that piperazine has the one advantage that we emphasize piperazine over cadmium is that piperazine is not known to have any tissue residue left in the animal after worming, and there has been some thought and I believe some work done on the fact that cadmium compounds do leave a tissue residue of the metal in the animal."

At no place in the record do we find the results of any experiments conducted by either Dr. Blair or Dr. Burch at or before the time of the filing of the application for the patent herein or the granting of the patent, bearing on the question of a possible tissue residue that might remain in the animal after deworming and after use of any of the cadmium compounds that are mentioned in the specifications of the patent.

Section 33, Title 35 U.S.C.A.Appendix, reads in part as follows:

"Before any inventor or discoverer shall receive a patent for his invention or discovery he shall make application therefor, in writing, to the Commissioner of Patents, and shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same; * * *".

In the case of Matheson v. Campbell, 2 Cir., 78 F. 910, 911, paragraph 8 of the syllabus reads as follows:

"The specifications of a patent for a color compound produced from coal-tar products set forth, by a general formula, as the broad invention or discovery, that any sulpho acids of any radical (a group comprising over 100 different substances), when treated according to the process described, would produce the compound of the patent. The patent then set forth, 'as an example,' a special process by which the compound was produced from one of these substances. In fact, only a few of the substances would produce the compound. *Held*, that the patentees were not entitled to a monopoly of all the substances which might be found, by future experiments, to produce the compound claimed; nor could the patent be construed as cov-

ering merely the particular substance used in their 'example,' and it was therefore void."

On page 915, we find the following:

"In other words, having himself experimented only with three or four bodies out of a group of hundreds, he proposes to set himself in the pathway of future experimenters with any or all of the other bodies, and, as the result of each new experiment is disclosed, will fire away at it, calculating to 'hit it if it is a deer, and miss if it is a cow.' * * *".

On page 916, we find the following:

" * * * The broad discovery that all sulpho acids may be thus transformed they certainly did not discover, for it is apparently undiscoverable, since most of them cannot be thus transformed by the process of the patent. Some future experimenter will have to make some new discovery, and invent some new process, before these other sulpho acids can be transformed into naphthol-black. We are referred to no authority, and know of no principle, which will sustain the complainant's contention that he can thus, in the language of the circuit court, 'speculate on the equivalents of his claimed invention, and thereby oblige the public to resort to experiments in order to determine the scope of the claims of his patent.' "

In the case of Kalle & Co. v. Multazo Co., Inc., 6 Cir., 109 F.2d 321, at page 325, we find the following:

"Where within a general classification disclosed by the claims, are compounds which do not answer the description of the specification, even though there be a general quality common to them all, yet if there be no common quality in respect to their effectiveness in achieving the inventive concept, claims for their exclusive use cannot be sustained. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 385, 48 S.Ct. 380, 72 L.Ed. 610; Metals Re-

covery Co. v. Anaconda Copper Mining Co., 9 Cir., 31 F.2d 100. We find no error in the holding of the court that the '16' patent is invalid for lack of adequate disclosure."

In the case of Libbey-Owens-Ford Glass Co. v. Celanese Corporation of America, 6 Cir., 135 F.2d 138, at page 145, we find the following:

" * * * Claims to the exclusive use of a large group of related chemical compounds, unsupported by proof that all have a common quality rendering each useful in the proportions patented, are too broad, and, therefore, claims for their exclusive use cannot be sustained. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct. 380, 72 L.Ed. 610. In this case, there was no peculiar fitness for a great number of the plastifiers and derivatives, in the proportions named, for the particular purposes sought. There must be a common quality in respect to their effectiveness in achieving the inventive concept. Kalle & Co. v. Multazo Co., Inc., 6 Cir., 109 F.2d 321. A patent monopoly is not to be extended to the use of a class of materials, some of the members of which are shown not to be effective in carrying out the inventive process. American Chemical Paint Co. v. Firestone Steel Products Co., 6 Cir., 117 F.2d 927; see, also, Matheson v. Campbell, 2 Cir., 78 F. 910, 911. The evidence in this case discloses that the patent was based on a hit or miss formula, which was not such a disclosure to those skilled in the plastic composition art or laminated glass art, as would enable them to practice its manufacture without experiment. See Solva Waterproof Glue Co. v. Perkins Glue Co., 7 Cir., 251 F. 64."

In the case of Patrol Valve Co. v. Robertshaw-Fulton Controls Co., 6 Cir., 210 F.2d 146, at page 152, we find the following:

"The findings of the special master, sustained by the district court,

that the claims of the patent encompassed inoperative materials and were, therefore, invalid as overclaiming the alleged invention, and that they did not describe the claimed invention in the terms required by the statute so as to enable a person skilled in the art to construct and practice the invention, are supported by substantial and persuasive evidence, and on no ground could be said to be clearly erroneous; * * * ".

From the record, we conclude that the requirements of an anthelmintic for hogs are that it be safe, efficient, reliable, palatable, and economical. Plaintiff tested but three cadmium compounds prior to the issuance of the patent, and, as a matter of fact markets an anthelmintic limited to the use of the compound cadmium oxide, which is one of the three compounds experimented with. There are cited in the patent a number of cadmium compounds as usable examples which were never tested by Dr. Blair or any one on behalf of plaintiff prior to the issuance of the patent. Whether any of these cited compounds would meet the requirements of an anthelmintic for hogs was unknown at the time of the issuance of the patent and, for that matter, is still unknown as to a number of them. A number of the cited examples, as well as a number of other cadmium compounds, have since been tested by Dr. Burch on behalf of plaintiff in 1955 (Plaintiff's Exhibit 10), and by Dr. Guthrie on behalf of defendant in 1955 (Defendant's Exhibit O). These tests disclose that, while some of the compounds meet the requirements, as apparently does the cadmium oxide used by plaintiff, yet a number of them do not meet the requirements and some are ineffective, unsafe, unpalatable, inefficient and unreliable. At least one of them, cadmium fluoacetate, causes almost instantaneous death of the animal experimented on.

Cadmium anthranilate, which is the compound employed by the defendant, apparently was not known at the date of the issuance of the Blair Patent to be an equivalent of cadmium oxide as a hog anthelmintic.

We conclude that claims 2, 7 and 9 herein relied upon by plaintiff are invalid because they are too broad and overclaim the invention. Six of the ten claims in the patent are, as we have pointed out, specifically limited to the use of the compounds cadmium oxide or cadmium chloride. These claims are unaffected by the finding as to claims 2, 7 and 9. These latter claims being, in the opinion of the Court, invalid, defendant is absolved of the charge of infringing them, and the complaint is dismissed at plaintiff's costs.

Findings of Fact and Conclusions of Law may be drawn by the defendant in accordance with this opinion and lodged with the Court within 15 days. Plaintiff may, within 15 days thereafter, file its exceptions or suggested additions thereto.